## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARK JORDAN,

                  **Plaintiff,**

     **v.**

                  **Case No. 22-1032-DDC**

CITY OF WICHITA, KANSAS, and
DARRELL KOHLS,

                  **Defendants.**

## MEMORANDUM AND ORDER

Wichita Fire Department policy provides that the second unit to arrive at a fire should take command. But, in August 2019, when plaintiff—WFD Captain Mark Jordan—arrived with the seventh unit at a fire on south Seneca Street, no one had taken command. Plaintiff took command of the fire, which was, to use plaintiff's words "a shit show." Plaintiff admits that he struggled in such a difficult situation. WFD Chief Elizabeth Snow testified that plaintiff nonetheless performed adequately and WFD Administration doesn't blame plaintiff for the problems at the Seneca Street Fire.

Later, when plaintiff's performance evaluation reached Chief Snow, she asked her staff to revise the evaluation and include a note about the Seneca Street Fire. Defendant Darrell Kohls added four sentences to plaintiff's review and lowered one portion of his score, but plaintiff's overall performance ranking didn't change. Kohls told plaintiff about the planned revisions. Plaintiff disagreed with them, and never signed his revised performance evaluation.

Plaintiff now brings this lawsuit, asserting that defendant City of Wichita[1] discriminated against him based on his race and retaliated against him for reporting race discrimination. Plaintiff also asserts a tort claim for misappropriation of identity against the City and Kohls. And plaintiff brings a claim under Kansas's Wayne Owen Act against the City.

Defendants have filed a Motion for Summary Judgment (Doc. 85).  The court grants the motion, concluding that plaintiff has failed to present a triable issue on his claims of race discrimination and retaliation because, in a nutshell, plaintiff has failed to adduce evidence that Chief Snow's reason for requesting a revised evaluation was a pretext for race discrimination. With the federal claims resolved, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims and thus dismisses those state law claims without prejudice.  The court explains its decisions, below.

## I.    Background

The following facts are uncontroverted or, where controverted, are stated in the light most favorable to plaintiff, the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Plaintiff has worked for the City of Wichita's Fire Department as a firefighter for over 25 years.  Doc. 81 at 2 (Pretrial Order ¶ 2.a.ii.).  Plaintiff is a Captain within the WFD.  *Id.* (Pretrial Order ¶ 2.a.iii.).  And plaintiff is an African American male.  *Id.* (Pretrial Order ¶ 2.a.ii.).

### *Plaintiff's Time as Acting Battalion Chief*

Under the WFD structure, a Battalion Chief sits one rank higher than a Captain.  Doc. 86-4 at 11 (Pavelski Dep. 32:2–12).  In 2019, plaintiff's supervisor, Battalion Chief Bradford Boyd, wanted to mentor and groom plaintiff to become a Battalion Chief.  Doc. 86-7 at 9–10 (Pl. Dep.

---

[1]      This Memorandum and Order uses the terms "WFD" and "the City" interchangeably to refer to defendant City of Wichita.

20:12–21:19); Doc. 92-7 at 1 (Boyd Decl. ¶ 6).  Boyd brought plaintiff to WFD station 16 to

serve as Acting Battalion Chief in Boyd's absence.  Doc. 92-7 at 1 (Boyd Decl. ¶ 6).

WFD policy requires that, to serve as an Acting Battalion Chief, a firefighter must have

approval from both the Battalion Chief and the Deputy Chief.  Doc. 86-4 at 16 (Pavelski Dep.

46:13–21); Doc. 86-12 at 1–2 (Apr. 14, 2020, HR Memo).  But WFD didn't always follow this

policy.  In the past, WFD has allowed Captains to fill in as Acting Battalion Chief if they were

stationed at a particular headquarters.  Doc. 86-4 at 23–24 (Pavelski Dep. 71:11–72:5).  Boyd

told Deputy Chief Joshua Pavelski about the plan for plaintiff to serve as Acting Battalion Chief

for entire shifts in Boyd's absence.[2]  Doc. 92-7 at 1 (Boyd Decl. ¶ 6).

Pavelski testified about a meeting in January 2020 where they discussed who would be

the best person to fill in as Acting Battalion Chief.  Doc. 86-4 at 18 (Pavelski Dep. 48:8–23).  At

the meeting, WFD selected Captain Kleinschmidt.  *Id.*  Plaintiff was removed as Acting

Battalion Chief.  *Id.* (Pavelski Dep. 48:2–11).

On March 2, 2020, plaintiff filed a discrimination complaint with defendant City of

Wichita's human resources department.  Doc. 86-15 (Discrimination Compl.).  Plaintiff alleged

that WFD took away his ability to serve as Battalion Chief based on racial bias.  *Id.* at 3

(Discrimination Compl.).  The human resources investigation, conducted by Susan Leiker and

dated July 22, 2020, found no direct evidence of race discrimination.  Doc. 86-16 at 3 (Leiker

Jordan Investigation).

---

[2]       Deputy Chief Pavelski testified that he told Battalion Chief Boyd that plaintiff could fill in as
Acting Battalion Chief for a few hours while Boyd was gone.  Doc. 86-4 at 15 (Pavelski Dep. 43:17–25).
Boyd submitted a declaration that disputes Pavelski's testimony.  *See* Doc. 92-7 (Boyd Decl.).  Boyd says
Pavelski agreed to have plaintiff serve as Acting Battalion Chief without any discussion of plaintiff
serving for just a few hours.  *Id.* at 1 (Boyd Decl. ¶ 6).  At summary judgment, the court must resolve this
factual dispute in plaintiff's favor.

### *Seneca Street Fire*

In August 2019—before the Acting Battalion Chief debacle—a strip mall on south Seneca Street caught fire. Doc. 81 at 3 (Pretrial Order ¶ 2.a.x.). WFD Policy provides that the second fire engine to arrive at a scene should assume command. Doc. 86-7 at 15 (Pl. Dep. 37:5–23). Plaintiff was on the seventh unit to arrive at the fire, but no one had assumed command. *Id.* So, plaintiff assumed command of the Seneca Street fire. Doc. 86-3 at 21 (Snow Dep. 114:7–17). With seven units already at the scene and assigned, plaintiff, as incident commander, had a lot of catching up to do. Doc. 92-14 at 3 (After Action Report Tr.). Plaintiff described the scene as a "shit show." Doc. 86-7 at 49 (Pl. Dep. 200:6–13). Plaintiff acknowledged that he struggled at the scene but believes that anyone in the same situation would have struggled. *Id.* at 50 (Pl. Dep. 202:4–13).

Chief Snow testified that plaintiff performed adequately at the Seneca Street Fire. Doc. 86-3 at 8, 18 (Snow Dep. 13:9–11, 57:2–11). Snow also testified that there were "areas in which he needed to improve." *Id.* at 18 (Snow Dep. 57:2–11). Plaintiff similarly acknowledged that there were ways that the WFD could have improved its response to the fire. Doc. 86-7 at 38–39 (Pl. Dep. 147:24–148:1). WFD Administration[3] does not blame plaintiff for the problems at the Seneca Street Fire. Doc. 86-4 at 9 (Pavelski Dep. 30:10–16).

WFD performed an "after action review" (AAR) of the Seneca Street Fire. Doc. 86-3 at 13 (Snow Dep. 43:9–12). In an AAR, WFD evaluates its strengths, weaknesses, and gaps at a given fire and develops areas of improvement for the next fire. *Id.* (Snow Dep. 43:13–25); Doc.

---

[3]      Defendants attribute Pavelski's statement to the entire WFD Administration. The court hesitates to conclude that Pavelski necessarily speaks for the entire WFD Administration, but plaintiff did not controvert this fact and the court thus accepts this fact as an undisputed one. Doc. 86 at 6 (Defs.' Statement of Fact ¶ 29); Doc. 91 at 4 (Pl.'s Resp. to Defs.' Statement of Fact) (listing Fact 29 as uncontroverted).

86-7 at 39 (Pl. Dep. 148:2–11).  Plaintiff wanted WFD to perform an AAR of the Seneca Street

Fire but, to his dismay, he was not involved in the AAR.  Doc. 86-7 at 39–40 (Pl. Dep. 148:12–

149:12).  Plaintiff heard through the grapevine that, to his surprise, the AAR participants "didn't

talk shit about" him.  *Id.* at 37–38 (Pl. Dep. 146:15–147:16); Doc. 86-9 at 12 (Jan. 11, 2021

Messages).

Ultimately, plaintiff did not receive any discipline for his work at the Seneca Street Fire.

Doc. 86-7 at 16 (Pl. Dep. 38:16–19).  Nonetheless, in 2021, plaintiff wrote in his personal

calendar that the Seneca Street Fire had ruined his career.  Doc. 86-20 (2021 Calendar).

Battalion Chief Jason Jones felt like the Seneca Street Fire ruined the careers of three people:

plaintiff, M.R., and Acting Battalion Chief Richard Bahr.  Doc. 92-4 at 6 (Jones Dep. 27:12–25).

Chief Snow criticized Battalion Chief M.R., another firefighter, for not taking command

of the Seneca Street Fire.  Doc. 92-3 (Pl. Decl. ¶ 4).  Indeed, when Chief Snow arrived at the fire,

she told M.R. that he should have taken command.  Doc. 86-7 at 19 (Pl. Dep. 49:2–4).  M.R.'s

next performance evaluation mentioned that M.R. should have taken command.  Doc. 86-10 at 4,

5 (M.R. 2020 Performance Appraisal).  Either Lieutenant Aaron Hall, who is white, or Captain

Larry Cook, who is an American Indian or Alaska Native, arrived at the Seneca Street Fire with

the second unit.  Doc. 81 at 3 (Pretrial Order ¶ 2.a.xi.).  Neither Hall nor Cook took command of

the fire.  *Id.*  And, neither Hall nor Cook's evaluations after the Seneca Street Fire mentioned

their failure to take command.  *Id.*

### Plaintiff's Evaluation

WFD evaluates its employees' performance yearly.  Doc. 86-2 at 1 (Snow Aff. ¶ 5).  In

2020, WFD updated its performance evaluation process, including its evaluation forms.  *Id.*

(Snow Aff. ¶ 6).  This case involves three separate performance reviews completed as part of

plaintiff's 2020 evaluation.  *First*, in July 2020, Acting Battalion Chief Richard Bahr completed

plaintiff's annual performance evaluation.  Doc. 86-5 at 17 (Bahr Dep. 72:7–15).  But Bahr used an outdated form.  Doc. 86-7 at 32 (Pl. Dep. 135:16–24).  On this outdated form, Bahr gave plaintiff a score of 3.79.  Doc. 86-5 at 10 (Bahr Dep. 56:17–21); Doc. 86-17 at 9 (First Evaluation).  This overall score of 3.79 equated to a "Performs Well" performance score.  Doc. 86-17 at 9 (First Evaluation).  "Performs Well" is the second-highest possible score for WFD employees.  *See, e.g.*, Doc. 86-31 at 3 (Third Performance Evaluation).

*Second*, WFD Administration asked Bahr to redo plaintiff's evaluation on the new form. Doc. 86-5 at 11–12 (Bahr Dep. 63:6–64:8).  The new form included four additional categories for evaluating employees.  *Compare* Doc. 86-17 (First Evaluation), *with* Doc. 86-18 (Second Evaluation).  Bahr testified that he "basically transferred the information from the first form to the second form."  Doc. 86-5 at 11–12 (Bahr Dep. 63:21–64:8).  Though he "basically transferred" information to the new form, Bahr gave plaintiff a score of 3.67 on the second performance evaluation.  *Id.* at 12 (Bahr Dep. 64:9–21); Doc. 86-18 at 15 (Second Evaluation). Bahr also reduced plaintiff's "Staff Training and Development" score from 4.5 to 4.  Doc. 86-5 at 14 (Bahr Dep. 67:4–7).  The 0.12 reduction in raw score didn't change plaintiff's overall performance rating of "Performs Well."  Doc. 86-18 at 15 (Second Evaluation).

Bahr and plaintiff discussed this second evaluation, which had reduced plaintiff's score by 0.12 points.  Doc. 86-5 at 13 (Bahr Dep. 66:2–9).  Plaintiff believed that the first rating was a bit too high.  *Id.* (Bahr Dep. 66:10–18).  Plaintiff never told Bahr that the second evaluation had damaged plaintiff's career.  *Id.* at 15 (Bahr Dep. 68:14–18).  This second evaluation did not affect plaintiff's ability to get a raise, his standing in the department, or how Bahr treated him. *Id.* at 15–16 (Bahr Dep. 68:18–69:6).

*Third*, when Chief Snow received plaintiff's performance evaluation, she returned it to Deputy Chief Pavelski.  Doc. 86-19 (Snow, Aug. 11, 2020 Email).  Chief Snow explained that the "scoring on Part A which includes ICS need[ed] to be reviewed for accuracy."  *Id.*  Chief Snow testified that she was referencing the Seneca Street Fire.  Doc. 86-3 at 17 (Snow Dep. 56:8–21).  Pavelski asked if Chief Snow wanted anything specific, and she replied that the evaluation just needed a "note of accountability" about plaintiff's performance at the Seneca Street Fire.  *Id.* at 19 (Snow Dep. 58:4–11).

### Bahr and Roberson Refuse to Alter Plaintiff's Evaluation

Bahr didn't include anything about the Seneca Street Fire in plaintiff's evaluation because the fire "wasn't during [his] time frame to rate" plaintiff.  Doc. 86-5 at 20 (Bahr Dep. 90:14–23).  Later, WFD removed Bahr's Acting Battalion Chief status and Bahr filed an age discrimination complaint.  Doc. 92-17 at 3 (Leiker Bahr Investigation).  A later investigation found that it was "possible" that WFD had removed Bahr's Acting Battalion Chief status because he refused to change plaintiff's performance evaluation.  *Id.*  Another Acting Battalion Chief, Colby Roberson,[4] also refused to change plaintiff's performance evaluation.  *Id.* at 2.  The same investigation found it was "possible" that WFD removed Roberson's Acting Battalion Chief status because he refused to change plaintiff's performance evaluation.  *Id.* at 3.  Chief Snow testified that it's insubordinate to refuse to alter documents as instructed.  Doc. 92-5 at 12 (Snow Dep. 104:20–22).  WFD, in Roberson's performance evaluation, did not mention that Roberson had refused to change plaintiff's performance evaluation.  Doc. 81 at 3 (Pretrial Order ¶ 2.a.ix.).  Roberson is white.  *Id.* (Pretrial Order ¶ 2.a.xvi.).

---

[4]     The summary judgment record contains two possible spellings of Chief Roberson's last name. The court uses "Roberson" in this Memorandum and Order and trusts this spelling is the correct one.  In any event, nothing in the summary judgment record suggests there ever was more than one Chief by this name.

Relatedly, in March 2021, Pavelski compiled a list of Roberson's performance deficiencies that did not make it into Roberson's performance evaluation.  Doc. 92-19 (Pavelski-Snow Mar. 5, 2021, Email).  Pavelski testified that the information was missing from the evaluation because "Chief Eck wouldn't have been aware . . . of any of it because he was not part of that."  Doc. 95-1 at 8 (Pavelski Dep. 122:5–21).  Pavelski had noticed that the information was missing from Roberson's review, so, on the advice of human resources, Pavelski sent the list of omitted deficiencies to Chief Snow.  *Id.*  Chief Snow retained the information separately from Roberson's performance evaluation.  Doc. 92-19 (Pavelski-Snow Mar. 5, 2021, Email); Doc. 92-17 at 2 (Leiker Bahr Investigation) ("Roberson has performance issues that were not documented in his performance appraisal (based on advice from . . . HR) but were recorded[.]").  Chief Snow testified that Pavelski maintains a separate file that contains information not included in performance evaluations for battalion chiefs and acting battalion chiefs.  Doc. 92-5 at 11 (Snow Dep. 102:3–11).  Leiker, of Human Resources, testified, "If there's negative information, it should be reported."  Doc. 92-16 at 11 (Leiker Dep. 37:7–12).

### *Kohls Modifies the Evaluation*

After Bahr and Roberson refused to revise plaintiff's evaluation, Pavelski delegated the task of revising plaintiff's evaluation to Division Chief Darrel Kohls.  Doc. 86-4 at 22 (Pavelski Dep. 63:1–15).  Kohls testified that it's his practice to only include true statements or statements with factual support in performance evaluations.  Doc. 92-10 at 8 (Kohls Dep. 16:20–23).  Kohls altered the "Judgment" section of plaintiff's evaluation.[5]  Doc. 86-14 at 7 (Kohls Dep. 14:14–

---

[5]      It's not clear when—at least not precisely when—Kohls made the changes.  The summary judgment record contains two memoranda from Kohls.  One says that, at the September 2, 2020, meeting, Kohls informed Bahr and plaintiff that plaintiff's performance evaluation *would be* revised.  Doc. 92-9 (Kohls Undated Mem.).  A longer, more detailed memorandum says that Kohls made the changes before the September 2 meeting.  Doc. 92-11 (Kohls Mar. 12, 2021, Mem.).  Plaintiff's papers assert that Kohls did *not* come to the September 2 meeting with a revised performance evaluation, so, construing disputed

17).  Kohls wrote, "During this rating period, [plaintiff] struggled as incident commander at a 2-alarm strip mall fire.  This has been identified as a deficit.  Since this occurrence, [plaintiff] has attended ICS training with Chief Wilson and Chief Ross.  His performance at this training was acceptable."  Doc. 86-11 at 9 (Third Evaluation); Doc. 86-14 at 7–8 (Kohls Dep. 14:23–15:11).  Kohls testified that he did not know the specifics about plaintiff's performance at the Seneca Street Fire, Doc. 92-10 at 8 (Kohls Dep. 16:1–3), and he did not know the factual basis for the statements he added to plaintiff's evaluation, *id.* at 8–9 (Kohls Dep. 16:24–17:25).

Kohls met with Bahr on September 2, 2020.[6]  Doc. 86-14 at 6 (Kohls Dep. 13:2–10); Doc. 86-22 at 1 (Kohls Mar. 12, 2021, Email).  Kohls told Bahr that he needed to revise plaintiff's performance evaluation because it was too high.  Doc. 92-1 at 11–12 (Bahr Dep. 78:21–79:4).  Plaintiff, who was also in the fire station at the time, overheard Bahr and Kohls talking about him.[7]  Doc. 86-7 at 63–64 (Pl. Dep. 224:11–225:8).  Plaintiff told Kohls that he disagreed with the revisions to his performance evaluation.  Doc. 86-14 at 11–12 (Kohls Dep. 20:10–21:7); Doc. 92-9 (Kohls Undated Mem.).  Plaintiff believes that WFD management added

facts in plaintiff's favor, the court will assume that Kohls did not make final changes to plaintiff's performance evaluation until after the September 2, 2020, meeting.

[6]    An email discussing this September 2, 2020, meeting asserts that the Kohls/Bahr meeting occurred on September 2, 2021.  Doc. 86-22 (Kohls March 12, 2021, Email).  But the email is dated March 12, 2021.  *Id.*  So, no reasonable factfinder could conclude that the meeting occurred on September 2, 2021.

[7]    The summary judgment record contains a March 12, 2021, memorandum from Kohls—the second Kohls memorandum, for those following along from footnote five—that recounts this September 2, 2020, meeting.  The memorandum reports:  "Towards the end of the discussion Captain Jordan offered to sign the revised" performance evaluation.  Doc. 92-11 (Kohls Mar. 12, 2021, Mem.).  At plaintiff's deposition, counsel read this sentence to plaintiff and asked if he agreed with it.  Doc. 92-2 at 17 (Pl. Dep. 236:16–23).  Plaintiff testified, "No, I didn't agree to sign that thing."  *Id.*

    Consistent with the March 12, 2021, memorandum, Kohls testified at his deposition that plaintiff offered to sign the revised third evaluation.  Doc. 86-14 at 16 (Kohls Dep. 44:11–22).  But plaintiff testified that he did not agree to sign it.  Doc. 92-2 at 17 (Pl. Dep. 236:16–23).  So, the court disregards defendants' statement that plaintiff offered to sign the revised performance evaluation.

language to his evaluation to make him a "scapegoat" for the Seneca Street Fire.  Doc. 86-7 at 65 (Pl. Dep. 227:16–24).

Plaintiff also takes issue with the way Kohls altered his evaluation.  At the bottom of evaluation, there's a checked box that says, "I hereby certify that the information contained in this performance appraisal has been reviewed and acknowledged by the employee specified on page one.  Entering employee name on the signature line below will serve as employee confirmation."  Doc. 86-11 at 15 (Third Evaluation).  This language, on its face, does not require the employee's signature, but, signature lines sit below the checked box for the employee, division manager, and department director.  *Id.*  This is an electronic document, so the signatures are electronic.  Thus, a supervisor should get an employee's authorization to place the employee's electronic signature on this page.  Doc. 92-5 at 8 (Snow Dep. 54:11–16).

Here's the relevant part of plaintiff's evaluation:



Doc. 86-11 at 15 (Third Evaluation).

To alter plaintiff's evaluation, Kohls secured a PDF of plaintiff's original evaluation. Doc. 92-10 at 11 (Kohls Dep. 24:17–20).  Kohls then modified the PDF, lowering the Judgment score and adding the four sentences about the Seneca Street Fire and ICS training.  *Id.* at 20–21 (Kohls Dep. 78:19–79:9).  When asked whether he knew about the check box at the time he

modified plaintiff's evaluation, Kohls testified, "I don't know. . . .  I apologize.  I'm not sure."
Doc. 92-10 at 15 (Kohls Dep. 28:1–7).

Plaintiff did not authorize Kohls to place his electronic signature on this third, revised
evaluation.  Doc. 92-2 at 20 (Pl. Dep. 248:3–5).  Earlier, in plaintiff's second evaluation—the
one where Bahr used an updated form and lowered plaintiff's score from 3.79 to 3.67—plaintiff
authorized Bahr to place his name on the form.  Doc. 86-5 at 11–12 (Bahr Dep. 63:19–64:8);
Doc. 92-2 at 11 (Pl. Dep. 139:1–15).

Plaintiff learned about the revised performance evaluation from Bahr.  Doc. 92-2 at 18–
19 (Pl. Dep. 245:14–245:8).  Bahr found out about the revised evaluation from Leiker during the
investigation into Bahr's complaint of age discrimination.  Doc. 92-1 at 15 (Bahr Dep. 124:15–
21).

### *After Effects*

As mentioned above, Kohls downgraded plaintiff's Judgment score from 4 to 2.  This
brought plaintiff's overall score down from 3.67 to 3.56.  Doc. 86-7 at 51 (Pl. Dep. 204:14–25).
Despite this reduction, plaintiff remained in the "Performs Well" category.  *Id.* at 56 (Pl. Dep.
214:10–17).  Because he remained in the "Performs Well" category, the revised performance
evaluation—the third in this saga of evaluations—did not affect plaintiff's ability to qualify for a
raise or other benefits.  *Id.* at 36 (Pl. Dep. 141:9–14).  The revised performance evaluation did
not cause WFD to demote plaintiff.  *Id.* at 61–62 (Pl. Dep. 219:16–220:9).  Plaintiff was
disappointed, angry, and furious that defendants placed his signature on the third revised
evaluation without his permission.  Doc. 92-2 at 20 (Pl. Dep. 248:3–19).

On March 3, 2021, plaintiff filed a grievance through his union "over the fraudulent
change in" his performance evaluation.  Doc. 86-32 (Union Grievance).  WFD denied the
grievance—concluding that WFD had not violated any relevant contracts.  Doc. 86-33

(Grievance Denial).  WFD, through Deputy Chief Pavelski, offered to discard plaintiff's disputed

performance review and replace it with a new one.  Doc. 86-4 at 27 (Pavelski Dep. 112:4–12);

Doc. 86-7 at 21 (Pl. Dep. 61:3–9).  Pavelski offered to include content to which all parties

agreed.  Doc. 86-4 at 27 (Pavelski Dep. 112:13–15).  Plaintiff and his union declined this offer.

Doc. 86-7 at 21 (Pl. Dep. 61:3–14).

Plaintiff is still a Captain in the WFD.  *Id.* at 7 (Pl. Dep. 14:23–25).  Plaintiff's salary has

"topped out," which means that he earns the highest wage possible for his rank.  *Id.* at 35 (Pl.

Dep. 140:17–24).  Though firefighters might "top out" their salaries, evaluations can still play a

role in their employment.  Battalion Chief Jones testified,

> [T]echnically by policy evaluations can affect someone's ability to be laid off
> or not.  That's a buried policy on performance evaluations. . . .  [I]f you and I
> came on in the same class of the fire department, we had the same tenure, and
> the fire department needed to lay people off due to budget cuts or whatever the
> case may be, if my performance evaluations over the years were better than
> yours they would lay you off and not me.  I think that's a buried policy about
> performance evaluations after you're topped out.

Doc. 92-4 at 5 (Jones Dep. 17:10–22).

## II.   Summary Judgment Standard

Summary judgment is appropriate where the moving party demonstrates there is "no

genuine dispute" about "any material fact" and that the movant is "entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  This standard dictates that the court "view the evidence

and make inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*,

625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243,

1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a

verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is

essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144 F.3d at 671). Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not

13

sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Finally, federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.   Analysis

Before diving into its legal analysis, the court pauses to recite and clarify plaintiff's claims. Plaintiff brings four claims:

1. Race discrimination, violating Title VII and 42 U.S.C. § 1981,[8] against defendant City of Wichita;

2. Retaliation, violating Title VII and 42 U.S.C. § 1981, against defendant City of Wichita;

3. Misappropriation of identity common law tort claim against defendant City of Wichita and defendant Kohls;

4. Wayne Owen Act violation against defendant City of Wichita.[9]

Doc. 81 at 12 (Pretrial Order ¶ 4.a.i–iv.). The court addresses plaintiff's claims of race discrimination and retaliation, in turn, below. But the court does not reach plaintiff's state law claims. The court concludes, instead, that plaintiff has failed to present triable issues of race

---

[8]     The Pretrial Order recites that plaintiff brings an Equal Protection race discrimination claim. Doc. 81 at 12 (Pretrial Order ¶ 4.a.i.). Plaintiff since has dropped his Equal Protection theory. Doc. 91 at 2.

[9]     The Pretrial Order recites that plaintiff brings his Wayne Owen Act claim against both defendant City of Wichita and defendant Kohls. Doc. 81 at 12 (Pretrial Order ¶ 4.a.iv.). The court previously granted judgment on the pleadings against plaintiff's Wayne Owen Act claim in favor of defendant Kohls. Doc. 82 at 11.

discrimination and retaliation, so it declines to invoke its supplemental jurisdiction over the state law claims under 28 U.S.C.§ 1367(c)(3).

### A.    Race Discrimination

Plaintiff brings his race discrimination claims against the City under Title VII and § 1981.  The same analytical framework applies to both theories.  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225–26 (10th Cir. 2000).  So, the familiar *McDonnell Douglas* burden-shifting framework applies to each version of plaintiff's race discrimination claim.  411 U.S. 792 (1973).

At the first step in the *McDonnell Douglas* framework, plaintiff "must carry the initial burden . . . of establishing a prima facie case of racial discrimination."  *Id.* at 802.  If plaintiff carries his burden, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the employment action.  *Id.*  If the employer defendants carry this burden, "plaintiff must then show that the defendant[s'] justification is pretextual."  *Kendrick*, 220 F.3d at 1226 (citing *McDonnell Douglas*, 411 U.S. at 804).

The court assumes, without deciding, that plaintiff could establish a prima facie case of discrimination; and the court concludes that defendants have established a legitimate, non-discriminatory reason for revising plaintiff's performance evaluation.  This claim's disposition thus turns on whether plaintiff has come forward with sufficient evidence to show a triable issue of pretext.

### 1.    Defendants' Legitimate, Nondiscriminatory Reason

At the second stage of *McDonnell Douglas*, the burden shifts to defendants.  Plaintiff doesn't contest that defendants have satisfied the second stage.  This stage's burden requires defendants to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802.  Our Circuit has explained that the defendant

15

employer, at this second step, doesn't "'need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)). "'[T]his stage of the analysis only requires the defendant to articulate a reason for the [employment decision] that is not, on its face, prohibited' and that is 'reasonably specific and clear.'" *Id.* (first alteration in original) (quoting *Flasher*, 986 F.2d at 1316 n.4).

Here, Chief Snow asked Pavelski to review plaintiff's second evaluation "for accuracy." Doc. 86-19 (Snow, Aug. 11, 2020 Email).  Chief Snow wanted Pavelski to add a "note of accountability" about plaintiff's performance at the Seneca Street Fire.  Doc. 86-3 at 19 (Snow Dep. 58:4–11).  And plaintiff acknowledged that the Seneca Street Fire was a "shit show," Doc. 86-7 at 49 (Pl. Dep. 200:6–13), and that he struggled at the scene, *id.* at 50 (Pl. Dep. 202:4–13). Defendants' reason for altering plaintiff's review is not facially prohibited—so, defendants have satisfied their burden at this step.  Also, plaintiff doesn't argue that defendants have failed to proffer a legitimate, non-discriminatory reason for modifying his performance evaluation.  *See generally* Doc. 91.  Defendants simply wanted plaintiff's performance evaluation to include information about the Seneca Street Fire.  This showing qualifies as a legitimate, nondiscriminatory reason satisfactory to discharge the City's burden at step two.  *Frappied*, 966 F.3d at 1058.  So, the court's analysis now turns to the third step of the *McDonnell Douglas* framework:  pretext.

### 2.    Pretext

At the third step of *McDonnell Douglas*, a plaintiff must establish a triable issue of pretext—that is, whether the articulated legitimate reason is really a pretext concealing

discriminatory animus.  A plaintiff may establish a triable issue of pretext by revealing
"'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could
rationally find them unworthy of credence and hence infer that the employer did not act for the
asserted non-discriminatory reason.'"  *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217
(10th Cir. 2002) (alteration in original) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th
Cir. 1997)).

When analyzing the pretext question, the court doesn't "ask whether the employer's
reasons were wise, fair or correct[.]"  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th
Cir. 2007).  Instead, the court asks "whether the employer honestly believed its reasons and acted
in good faith upon them."  *Id.* at 1119.  So, the court considers "the facts as they appeared to the
person making the decision," and the court can't "second-guess the employer's decision even if
it seems in hindsight that the action taken constituted poor business judgment."  *Id.*  "'The reason
for this rule is plain:  [the court's] role is to prevent intentional discriminatory . . . practices, not
to act as a "super personnel department," second guessing employers' honestly held (even if
erroneous) business judgments.'"  *Id.* (quoting *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th
Cir. 2006)).

The court begins its pretext analysis by focusing on what, according to plaintiff,
defendants did wrong.  Plaintiff argues that the City racially discriminated against him when it
"alter[ed] his 2020 evaluation along with his signature, and pass[ed] it off as though [plaintiff]
had reviewed it and signed it."  Doc. 91 at 22.  Plaintiff argues that the City's revisions to his
performance evaluation "include[d] false and derogatory information[.]"  *Id.* at 24.  Going
further, plaintiff argues that the City's method of revising his performance evaluation "by

surreptitiously altering the document after [plaintiff] executed it, reproducing his signature page with the certification that he had reviewed it, and then stuffing it into the file[,] depriv[ed] [plaintiff] of basic dignity[.]" *Id.*

To show a triable issue of pretext, plaintiff makes three arguments. First, he takes issue with WFD's means of revising his performance evaluation. Second, he argues disparate treatment. And last, he argues that Pavelski has said conflicting things about plaintiff's evaluation and engaged in age discrimination. The court considers each argument, in turn, below.

### a.  Means of revising plaintiff's performance evaluation

Plaintiff argues that the means the City used to alter his performance evaluation show that material issues of fact remain about plaintiff's race discrimination claim. In support of this argument, plaintiff cites the following summary judgment evidence:

- Kohls didn't know about the check box at the bottom of the evaluation;

- Kohls didn't show plaintiff the revised evaluation, though in March 2021, he wrote that plaintiff had seen the revised evaluation and offered to sign it; and

- Kohls added language about the Seneca Street Fire to plaintiff's evaluation without knowing anything about plaintiff's performance at the Seneca Street Fire.

Doc. 91 at 28. This evidence fails to create a triable issue of pretext.

Plaintiff's complaints about the City's *means* of revising his performance evaluation don't undermine the City's *reason* for the revision. *See Garrett*, 305 F.3d at 1217 (requiring plaintiffs to show pretext with "weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's *proffered legitimate reasons* for its action" (emphasis added) (citation and internal quotation marks omitted)). Chief Snow asked Pavelski to review plaintiff's performance review "for accuracy," Doc. 86-19 (Snow, Aug. 11, 2020 Email), and told Pavelski

to add a "note of accountability" about the Seneca Street Fire, Doc. 86-3 at 19 (Snow Dep. 58:4–11).  Pavelski delegated that responsibility to Kohls, and Kohls added the note about the Seneca Street Fire.

Though plaintiff has much to say about Pavelski and Kohls, he has failed to adduce evidence that controverts Chief Snow's initial judgment that plaintiff's evaluation should mention the Seneca Street Fire.  Chief Snow testified that plaintiff "performed adequately" at the Seneca Street Fire.  Doc. 86-3 at 8 (Snow Dep. 13:9–11); *see also id.* at 18 (Snow Dep. 57:2–11).  Chief Snow also testified that there were "areas in which [plaintiff] needed to improve."  *Id.*  Plaintiff himself testified that he struggled at the scene, Doc. 86-7 at 50 (Pl. Dep. 202:4–13), and that there were ways to improve WFD's response to the fire, *id.* at 38–39 (Pl. Dep. 147:24–148:1).

Here's the language that Kohls added to plaintiff's performance evaluation:  "During this rating period, [plaintiff] struggled as incident commander at a 2-alarm strip mall fire.  This has been identified as a deficit.  Since this occurrence, [plaintiff] has attended ICS training with Chief Wilson and Chief Ross.  His performance at this training was acceptable."  Doc. 86-11 at 9 (Third Evaluation).  This revision matches Chief Snow's initial request for an accurate review that mentioned the Seneca Street Fire.  Plaintiff may disagree with Chief Snow's decision to add this information to his evaluation but, as defendants correctly note, the court's role is "not to act as a super personnel department[.]"  *Riggs*, 497 F.3d at 1119 (citation and internal quotation marks omitted).

Though Pavelski and Kohls might have found a fairer way to address the situation—or, at least, one that plaintiff would deem fairer—no reasonable factfinder could find that their methods qualify as the "disturbing procedural irregularity sufficient to prove pretext."  *Riggs*,

497 F.3d at 1119 (citation and internal quotation marks omitted).  Kohls just did his job.  And, critically, Pavelski offered to discard plaintiff's disputed performance review and replace it with a new one.  Doc. 86-4 at 27 (Pavelski Dep. 112:4–12); Doc. 86-7 at 21 (Pl. Dep. 61:3–9).  Pavelski offered to include content to which all parties agreed.  Doc. 86-4 at 27 (Pavelski Dep. 112:13–15).  This seriously undermines plaintiff's argument that WFD committed "serious misconduct" that was "unlawful."  Doc. 91 at 30.  Plaintiff had an opportunity to resolve all of his complaints about the means that Pavelski and Kohls used to revise his evaluation, but he didn't take it.  No reasonable factfinder could find pretext based on the means WFD used for revising plaintiff's evaluation because plaintiff hasn't adduced evidence that undermines WFD's ends.

### b.    Disparate treatment

Plaintiff also argues that he has shown a triable issue of pretext because he has adduced evidence of disparate treatment.  To utilize the disparate treatment argument, plaintiff must demonstrate "that the employer treated the plaintiff differently from other similarly-situated employees who violated work rules of comparable seriousness in order to show that the employer failed to follow typical company practice in its treatment of the plaintiff." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167–68 (10th Cir. 2007) (citation, internal quotation marks, and brackets omitted).  If "the employer's differential treatment of similarly-situated employees is trivial or accidental or explained by a nondiscriminatory motive, such treatment is insufficient to create an inference of discrimination." *Id.* at 1168 (citation and internal quotation marks omitted).

To support his disparate treatment argument, plaintiff cites the following evidence:

- Two white Acting Battalion Chiefs were insubordinate when they refused to alter plaintiff's performance evaluation, but this insubordination didn't make it into their reviews;

- Pavelski keeps secret files:  information about other employees' performance that he does not include in their performance evaluations;

- Plaintiff's white co-workers' evaluations didn't address their performance deficiencies.

Doc. 91 at 28–29.

The problem with plaintiff's reliance on the insubordinate Acting Battalion Chiefs is obvious:  plaintiff wasn't insubordinate.  Indeed, no party alleges or argues that plaintiff has violated any WFD rules or policies.  And plaintiff hasn't shown that he was an Acting Battalion Chief at the time that the two white Acting Battalion Chiefs were insubordinate.  The two white, insubordinate Acting Battalion Chiefs thus do not support plaintiff's disparate treatment argument because they do not qualify as "other similarly-situated employees who violated work rules of comparable seriousness[.]"  *Swackhammer*, 493 F.3d at 1167–68 (citation and internal quotation marks omitted).  The court simply can't compare plaintiff's evaluation with the evaluations of two employees of a different rank who broke rules that plaintiff didn't break.

Plaintiff also cites evidence about other employees whose performance deficiencies didn't make it into their performance evaluations.  Take Roberson, for example.  Pavelski had a "secret file" of Roberson's performance deficiencies that didn't make it into Roberson's performance evaluation.  Doc. 92-19 (Pavelski-Snow Mar. 5, 2021, Email).  Plaintiff argues that Pavelski didn't extend him the same courtesy because of plaintiff's race, but the summary judgment record offers two nondiscriminatory explanations.  *First*, in her investigation of Bahr's age discrimination complaint, Leiker wrote that Roberson "had performance issues that were not documented in his performance appraisal (based on advice from PP in HR) but were recorded[.]"  Doc. 92-17 at 2 (Leiker Bahr Investigation).  So, though Leiker testified that negative information should be reported in performance evaluations, a "PP in HR" told Pavelski

21

something different.  *Second*, Chief Snow explained that Pavelski keeps separate files of information outside of performance evaluations "on all his battalion chiefs and acting battalion chiefs."  Doc. 92-5 at 11 (Snow Dep. 102:3–11).  Plaintiff wasn't an Acting Battalion Chief in September 2020, when Kohls revised plaintiff's performance evaluation.  In sum, the summary judgment record offers two unrebutted, non-discriminatory explanations why Pavelski didn't put plaintiff's Seneca Street Fire deficiencies in a "secret file."

Plaintiff also argues he has shown disparate treatment because WFD did not hold his other non-African-American colleagues accountable for their failures at the Seneca Street Fire. But plaintiff's argument fails to account for M.R.  Chief Snow criticized another white firefighter, Battalion Chief M.R., for not taking command of the Seneca Street Fire.  Doc. 92-3 (Pl. Decl. ¶ 4).  M.R.'s next performance evaluation—by Pavelski—mentioned M.R.'s failure. Doc. 86-10 at 1, 4, 5 (M.R. 2020 Performance Appraisal).

In sum, no reasonable factfinder could conclude that plaintiff's disparate treatment evidence shows that the City discriminated against him on the basis of race.

### c.     Pavelski

For his last pretext argument, plaintiff trains his focus on Pavelski.  Specifically, plaintiff cites the following evidence:

- In February 2021, Pavelski told Leiker that he didn't believe plaintiff's performance evaluation had been altered, but he knew in September 2020 that Kohls had altered plaintiff's performance evaluation;

- Pavelski approved of plaintiff serving as Acting Battalion Chief for Boyd, but later stripped plaintiff of his Acting Battalion Chief status;

- Pavelski discriminated against another Captain on the basis of that Captain's age.

Doc. 91 at 29.

Plaintiff has trained his focus on the wrong issues.  He has failed to tie his complaints about Pavelski to WFD's proffered reason for altering plaintiff's performance evaluation. Pavelski's inconsistencies and age discrimination fail to show that Chief Snow's proffered reason for altering plaintiff's evaluation was one that a rational jury could find "unworthy of belief."  *Morgan*, 108 F.3d at 1323 (citation and internal quotation marks omitted).

Even considering the totality of plaintiff's circumstantial evidence of pretext, plaintiff has failed to adduce evidence that exposes "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in'" Chief Snow's desire for plaintiff's performance evaluation to include an accurate recounting of his performance at the Seneca Street Fire, such "that a reasonable factfinder could rationally find [Chief Snow's reasoning] unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason.'" *Garrett*, 305 F.3d at 1217 (quoting *Morgan*, 108 F.3d at 1323).  The court thus grants summary judgment to the City on plaintiff's race discrimination claim.

### B.    Retaliation

Plaintiff asserts that defendants modified his performance evaluation as retaliation for complaining about retaliation discrimination.  "In relevant part, Title VII's anti-retaliation provision makes it unlawful for 'an employer to discriminate against' an employee 'because he has opposed any practice made an unlawful employment practice by'" Title VII.  *Oldridge v. City of Wichita, Kan.*, No. 22-3104, 2023 WL 3965839, at *3 (10th Cir. June 13, 2023) (quoting 42 U.S.C. § 2000e-3(a)).  The *McDonnell Douglas* burden-shifting framework also applies to plaintiff's Title VII and § 1981 retaliation claims.  *Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014) (applying *McDonnell Douglas* framework to Title VII and § 1981 retaliation claims).

To assemble a prima facie case of retaliation, plaintiff must prove: "(1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found that challenged action materially adverse[,] . . . and (3) that a causal connection exists between the protected activity and the materially adverse action." *E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 803 (10th Cir. 2007) (citations omitted). If plaintiff "establishes a prima facie case of retaliation, the burden shifts to [the employer] to assert a legitimate, nondiscriminatory reason for the adverse action." *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007) (citation omitted). If the employer "provides a legitimate, nondiscriminatory reason for its decision, the burden shifts back to [plaintiff] to show that [the employer's] proffered reason is a pretext masking discriminatory animus." *Id.* (citation and internal quotation marks omitted). The court's analysis focuses on the City's argument that plaintiff's retaliation claim fails at step three: causal connection. Doc. 86 at 29.

Unless the employer's adverse action "is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007) (citation and internal quotation marks omitted). While no bright line defines how close in time the events must occur for a plaintiff to rely on temporal proximity alone, the Tenth Circuit has held that a one-and-a-half-month gap was sufficient while a three-month gap was too long. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006) (citing *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994)); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (concluding that "three-month period between the [protected] activity and termination" did not establish a causal connection); *see also Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1204 (10th Cir. 2008) (concluding that a period of more than three months

between the protected activity and the alleged retaliatory action was insufficient, as a matter of law, to establish a causal connection); *Piercy*, 480 F.3d at 1198 (acknowledging that an adverse employment action that occurred three months after protected activity cannot, standing alone, demonstrate causation); *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1183–84 (10th Cir. 2002) (concluding that a period of almost three months between the protected activity and the alleged retaliation doesn't permit an inference of causation). Of course, "temporal remoteness is not necessarily dispositive." *Piercy*, 480 F.3d at 1199. A plaintiff claiming retaliation can still establish a causal connection "if additional evidence establishes the retaliatory motive." *Id.* at 1198–99 (emphasis omitted).

　　Here, plaintiff complained of race discrimination on March 2, 2020. Chief Snow returned plaintiff's review to Pavelski on August 11, 2020, and plaintiff learned of Kohls's plan to revise his performance evaluation on September 2, 2020. Kohls made the final revisions to plaintiff's evaluation after the September 2020 meeting. The five to six months between these two actions—March 2020 to August/September 2020—is insufficient for the court to presume causation. *See Hinds*, 523 F.3d at 1204 (affirming summary judgment where "over three months elapsed" between protected activity and alleged retaliation because "a three-month period of time between the protected activity and [the] first alleged instance of retaliation is insufficient to establish a causal connection as a matter of law" (citation, internal quotations marks, and brackets omitted)). Mindful of his timing problem, plaintiff cites additional evidence to establish retaliatory motive: "depriving [plaintiff] of the dignity of his own name and signature," the "dishonesty itself," and the "abundant evidence of dishonest, pretextual conduct by the City in regard to [plaintiff's] 2020 evaluation and the events leading to it[.]" Doc. 91 at 32. Plaintiff thus has invoked pretext. The court can consider evidence of pretext in the causal-connection

25

portion of the prima facie case.  *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003).

As an initial matter, the court does not consider plaintiff's vague cite to "abundant evidence of dishonest, pretextual conduct" sufficient to carry his burden at summary judgment. In any event, the court incorporates its earlier analysis, above, concluding that plaintiff has failed to present a triable issue of pretext.  Plaintiff's other two pieces of evidence focus on the means Kohls and Pavelski used to revise his performance evaluation.  As explained above, the means that WFD used to revise plaintiff's evaluation can't justify an inference of retaliatory motive. Kohls was just doing his job.  Pavelski's and Kohls's actions do not undermine Chief Snow's stated desire for plaintiff's performance evaluation to include an accurate recounting of the Seneca Street Fire.  In sum, no reasonable factfinder could conclude that the City retaliated against plaintiff in September 2020 by revising his performance evaluation based on his March 2020 complaint about race discrimination.[10]

## C.    State Law Claims

In addition to his federal claims, plaintiff asserts a state tort claim for misappropriation of identity against defendant City of Wichita and defendant Kohls and a claim under Kansas's Wayne Owen Act against defendant City of Wichita.  Doc. 81 at 12 (Pretrial Order ¶ 4.a.i–iv.).

Under 28 U.S.C. § 1367(c)(3), the court may decline to exercise supplemental jurisdiction over state law claims if it has "dismissed all claims over which it has original jurisdiction[.]"  Section 1367 "reflects the understanding that, when deciding whether to exercise

---

[10]     At this point, the court has concluded that plaintiff's race discrimination and retaliation claims fail on their merits.  Plaintiff brings these claims against the City under § 1981.  To succeed on these claims under § 1981, plaintiff must also establish the City's liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  But, because the court has concluded that plaintiff's race discrimination and retaliation claims fail on their merits, the court need not resolve the *Monell* issues.

supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). In "the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7. Also, notions "of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).

Our Circuit has expressed the preference that, when a district court dismisses all federal claims, it typically should decline to exercise supplemental jurisdiction over state law claims. *See Smith v. City of Enid ex rel. City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)). But still, the decision is committed to the district court's sound discretion. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004).

The court, in its discretion, declines to exercise supplemental jurisdiction over plaintiff's state law claims. The court finds no compelling reasons to depart from our Circuit's general directives. Fairness and comity provide that a state court should resolve plaintiff's state law claims. So it is here.

## IV.    Conclusion

For the reasons stated in this Memorandum and Order, the court grants defendants' Motion for Summary Judgment (Doc. 85) against plaintiff's race discrimination and retaliation

claims under Title VII and § 1981.  The court dismisses plaintiff's state law claims without prejudice.  The court directs the Clerk to enter Judgment in accordance with this Memorandum and Order, and close this case.

      **IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 85) is granted.

      **IT IS SO ORDERED.**

      **Dated this 8th day of September, 2023, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
